**Sonny WARF SSN: 406–76–2987, Plaintiff,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

**Civ. A. No. 93–0095–B.**

United States District Court,
W.D. Virginia,
Big Stone Gap Division.

Feb. 17, 1994.

---

H. Ronnie Montgomery, Jonesville, VA, for plaintiff.

John F. Corcoran, Asst. U.S. Atty., Roanoke, VA, for defendant.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, Senior District Judge.

Plaintiff has filed this action challenging the final decision of the Secretary of Health and Human Services denying plaintiff's claim for supplemental security income benefits under the Social Security Act, as amended, 42 U.S.C. § 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c), which incorporates § 205(g) of the Social Security Act, 42 U.S.C. § 405(g). As reflected by the memoranda of law and argument sub-

mitted by the parties, the issue now before the Court is whether the Secretary's final decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g).

## FACTS

The claimant in this case, Mr. Sonny Warf ("Warf"), filed an application for Supplemental Security Income on August 29, 1991. In his application Warf alleged disability, dating from December 1988, due to a fractured right arm and "nerves." (Record at 80) (hereinafter R. at ___). This application was denied initially and upon reconsideration. (R. 95 & 115). Following this rejection, claimant requested a hearing before an administrative law judge ("ALJ") to review his application.

At the hearing on September 30, 1992, Warf presented a bevy of medical reports from various doctors cataloging his maladies. Beginning in February of 1991 Warf was seen by Drs. Ambrosia, Bell, Willis, Dubin and Bryan for the pain in his arm, while Drs. Young, Johnson, Nelson, McGraw, Lanthorn and Leizer examined Warf's mental condition.

These doctors offered various diagnoses as to the nature and extent of Warf's problems. These diagnoses were generally consistent with regard to claimant's arm injury, with the only major conflict arising as to the duration of claimant's disability.[1] On the issue of claimant's mental condition, the doctors diagnosed Warf as being illiterate and functioning at a borderline intellectual level.[2] (R. 141 & 157).

This evidence was presented to the ALJ at the hearing and testimony was heard from three witnesses.[3] Dr. Thomas Schacht, a psychologist, testified that in light of the medical record before the court Warf appeared illiterate and that any anxiety and depression were not severe. (R. 61). Dr.

Schacht further testified that Warf's main impairment was his borderline IQ although claimant could understand and follow simple instructions, make simple decisions and relate to others appropriately. (R. 61–65).

Following Dr. Schacht's testimony, Dr. Norman Hankins, a vocational expert ("VE"), testified as to Warf's qualifications to perform work in the national economy. The ALJ presented the VE with a hypothetical, taking into account claimant's medical and mental limitations, and the VE indicated that Warf was capable of acting as a flagger for construction projects. (R. 75).

The ALJ rendered his opinion on November 27, 1992 and held that Warf was not under a disability. This opinion became the final decision of the Secretary on March 22, 1993 when it was approved by the Appeals Council. Following approval by the Appeals Council, claimant sought review of the decision in this Court on April 8, 1993.

## DISCUSSION

Review by this Court is limited to a determination as to whether there is substantial evidence to support the Secretary's final decision. If substantial evidence exists, this Court's "inquiry must terminate," and the final decision of the Secretary must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir.1966). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws*, at 642. *See Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

Claimant claims that the decision of the ALJ is not supported by substantial medical evidence and should be overturned. More

---

1. Dr. Bell claimed that Warf was totally disabled from February 26 to April 17, 1991. (R. 149). Dr. Willis claimed that Warf was totally disabled beginning on August 5, 1991 and extending for an indefinite period. (R. 176).

2. Drs. Nelson and McGraw examined claimant on June 15, 1992 and concluded that Warf was depressed, clinically retarded and had anxiety

neurosis. These findings are at variance with the findings by the other four doctors and represent an extreme not supported by the medical evidence presented.

3. The witnesses were Sonny Warf, claimant; Dr. Thomas Schacht, a psychologist; and Dr. Norman Hankins, a vocational expert.

specifically, Warf asserts that the ALJ improperly failed to treat Dr. Willis as a treating physician, and therefore, failed to accord his finding of disability the proper weight. Warf also contends that the requirements for the job of flagger, listed in the *Dictionary of Occupational Titles* ("DOT"), are incongruent with the restrictions placed upon the claimant by the medical and psychological evidence. Because the Court finds substantial evidence to support the Secretary's findings, the decision below is affirmed.

## A. Treating Physician

█ In his opinion, the ALJ found that Dr. Bell, and not Dr. Willis, was Warf's treating physician. (R. 19). This determination is supported by the conclusory statement that "the record also shows that Dr. Bell, not Dr. Willis, is the claimant's treating physician...." (R. 19). The Court believes this determination to be unsupported by the evidence. The record indicates that Dr. Willis was seen by Warf the same number of times as was Dr. Bell, over roughly the same time period. In addition, both doctors offered diagnoses which were generally consistent and differed only in the duration of the disability.

█ The record indicates that Dr. Willis should also have been considered a treating physician. However, despite the fact the ALJ erred in failing to accord Dr. Willis treating physician status, the ultimate finding of nondisability by the ALJ continues to be supported by substantial evidence. As was noted earlier, the opinions of the various doctors concerning Warf's arm problem are generally consistent. In the entire medical record there are only two findings of disability based on Warf's arm problems. These two findings, from Drs. Bell and Willis, are "entitled to great weight." *Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir.1983). Despite this owed deference, the Court is not bound by a treating physician's finding of disability if there is persuasive contradictory evidence. *Id.*

This Court finds that on the record before it, there is persuasive evidence contradicting Dr. Willis' finding of indefinite disability. The contradictory evidence comes from two sources, Dr. Willis' report and the testimony of the claimant. The supplemental report of disability prepared by Dr. Willis gives a rather conclusory diagnosis of total indefinite disability. (R. 176). There are several pages of notes attached to this report, possibly in support of the disability finding, but the notes give little basis for Dr. Willis' finding. (R. 177–183). Moreover, nowhere does Dr. Willis give a detailed explanation of the findings which support his disability conclusion.

This lack of detail stands in stark contrast to the reports generated by Dr. Bell in reaching his conclusion that Warf was totally disabled from February 26, 1991 through April 17, 1991 and partially disabled from July 1991 through the present. (R. 159). There are nineteen pages of typed notes from Dr. Bell which detail his reasoning for his finding of disability. Dr. Bell's reasoning and thoroughness are more persuasive than Dr. Willis' conclusory statement concerning Warf's disability and the ALJ was justified in according them more weight than Dr. Willis' reports, even though both are treating physicians.

The ALJ was likewise justified in his finding of no disability based upon Warf's testimony at the hearing. Warf's testimony appears to contradict Dr. Willis' finding of total disability. At the hearing Warf testified under oath that he was capable of lifting small amounts of weight (R. 53) and that he often goes hunting. (R. 55). These statements indicate that the claimant is not totally disabled, especially in light of the opinions offered by the other doctors. For these reasons, the Court finds the ALJ's rejection of Dr. Willis' opinion, that Warf is totally disabled, to be based on persuasive contradictory evidence and supported by substantial medical evidence.

## B. Dictionary of Occupational Titles

The second issue in this appeal appears to be a question of first impression in this district and possibly in the United States. The plaintiff asserts that when the VE relied upon the *Dictionary of Occupational Titles* ("DOT"), U.S. Department of Labor, *Dictionary of Occupational Titles* (4th ed. 1991), to

support his finding that Warf could perform the job of flagger, his conclusion was in conflict with the evidence of illiteracy submitted by the claimant. More specifically, plaintiff points to the language in the DOT which sets forth the requirements to be a flagger.[4] The DOT recommends that a flagger have level two reasoning skills or be able to "[a]pply common sense understanding to carry out detailed but uninvolved ... instructions...."; have level one mathematical skills or be able to "[a]dd and subtract two digit numbers [and] [m]ultiply and divide 10's and 100's by 2, 3, 4, 5...."; and level two language skills or a "... vocabulary of 5,000–6,000 words. Read at a rate of 190–215 words per minute. Write compound and complex sentences ... [and] [s]peak clearly and distinctly with appropriate pauses...." *Id.* at 1011.

The medical evidence presented by the plaintiff paints a vivid picture of Warf as a man who is illiterate and borderline mentally retarded. (R. 141). Further, at the disability hearing, the ALJ asked the VE to render his opinion as for an individual who was illiterate (R. 69).

The plaintiff draws the Court's attention to the inapparent but obvious fact that if Warf is illiterate he is unable to read 190–215 words per minute and most likely does not have a vocabulary of between five and six thousand words. It is also clear from the testimony given by claimant at the hearing that he does not possess the speaking abilities suggested by the DOT.

This contradiction between the plaintiff's ability to perform as a flagger and the "definitional requirements" of the DOT raises an interesting issue for the Court. Are the "definitional requirements" of the DOT binding on the ALJ in deciding the claimant's ability to perform a certain job? For the reasons stated below, this Court concludes that the "definitional requirements" for the jobs listed in the DOT are

merely advisory in nature and serve only as a reference for the ALJ and VE.

The plaintiff suggests that this Court adopt a rule which would require the VE to be bound by the "definitional requirements" of the DOT. This holding would in effect make illiteracy a per se disability. While it is true that plaintiff does not meet the "definitional requirements" as set forth in the DOT for a flagger, it is also true that he does not meet even the most minimal "definitional requirements" listed in the DOT.

Level one, the lowest level, of language development provides that an individual must be able to read at a rate of 95–120 words per minute, print simple sentences containing a subject, verb and object and a series of numbers, names and addresses. This seemingly basic requirement would obviously be impossible for an individual who was illiterate. As a result, since every job requires at least a level one ability in language, there are no jobs in the DOT which can be performed by someone who is illiterate.

In *English v. Shalala*, 10 F.3d 1080 (1993), the Fourth Circuit held that the use of an outdated DOT by a VE constituted reversible error. In *English* the VE relied upon a superseded edition of the DOT in reaching his determination as to the number of jobs the claimant could perform. In support of its ruling, the Fourth Circuit pointed out that there were major differences between the edition of the DOT used by the VE and the current edition. The differences centered mainly on the reclassification of jobs from sedentary to light. This reclassification affected the claimant's physical ability to perform particular jobs, and therefore, the VE's opinion was contradicted by the medical evidence. *Id.* at 1085.

It is not clear what impact this ruling has on the status of the DOT in the Fourth Circuit, but it does not seem to modify 20 C.F.R. 404.1566(d)(1) which says that the ALJ "will take notice of—(1) *Dictionary of Occupational Titles*, published by the De-

---

4. In setting forth the requirements for the various occupations listed in the DOT, the Department of Labor has established a grading system to help classify what is required for each job. U.S. Department of Labor, *Dictionary of Occupa-*

*tional Titles* 1010–1011 (4th ed. 1991). Each job is assigned a rating, on a scale of 1–6, in the areas of reasoning development, mathematical development and language development.

partment of Labor." This regulation indicates that the DOT may be noticed by the ALJ in the disability proceeding. The regulation does not indicate that the DOT is binding on the ALJ or that he is bound by the "definitional requirements" for the various jobs.

As noted above, to hold that the DOT "definitional requirements" are binding on the ALJ would lead to the absurd result of rendering anyone who is illiterate unqualified and unable to perform any of the jobs in the DOT. A common sense approach to the problem illustrates this point. Before his arm injury, Warf was an electrician's helper (R. 45) which under the DOT requires a language level of two, *DOT* at 871, the same as a flagger. Clearly, illiteracy does not in and of itself disable Warf from performing any number of jobs in the national economy. The faceless bureaucrats who formulated these "definitional requirements" have clearly evidenced their fear of the spectre of the obvious by propagating illogical and unrealistic criteria for the most basic of vocations.

### CONCLUSION

The DOT lists the reasoning level of a judge as level 6, the highest level.[5] U.S. Department of Labor, *Dictionary of Occupational Titles* 85 (4th ed. 1991). As such this Court must be able to "[a]pply principles of logical or scientific thinking to a wide range of intellectual and practical problems." *Id.* Applying principles of logic and public policy to this case, the Court holds that the "definitional requirements" dealing with reasoning, mathematical and language development are merely advisory in nature. The Court further holds that the ALJ's finding of nondisability was supported by substantial evidence. To hold otherwise would be to unleash a torrent of disability claims which would surely overwhelm the current Social Security system.[6]

---

**5.** In contrast the individuals who prepare the *DOT*, occupational analysts, *DOT* at 108, and job analysts, *DOT* at 111, require only a reasoning level of 5.

**6.** Current figures from The National Center for Educational Statistics place the number of functionally illiterate adults at around 85 million.